King *v.* Hamilton.

NICHOLAS KING, Appellant, *v.* JOHN C. HAMILTON, Administrator of William King, deceased, and others, Appellees.

. ·APPEAL FROM MORGAN.

Where it appeared that a party in 1833, had left wheat in the hands of his agent, and thereupon returned to England, and remained beyond seas until 1849, when he returned, and sought in 1851 to make his agent answer for the price of the wheat; *Held*, that the statute of limitations had run, and that the cause of action . was barred.

Where one of three partners, engaged in a real estate adventure, left some cattle with his co-partners, bought with his own individual means, which were by them converted into money, and that money by them again invested in the general adventure; *Held*, that the proceeds of the cattle made a part of the trust fund, and continued with the trust, and were not subject to be barred by the statute of limitations, as between trustee and *cestui que trust*.

The law will allow expenses and charges, to trustees and partners, if provision is made by agreement therefor, not otherwise.

The allowance of interest in a bill or an action for an account as between partners, is proper, where the enterprise contemplates an active use of capital with the object of its increase, whether the capital was land or money.

Where one of three partners took a portion of the partnership funds, and invested it in lands in a distant State, with the declared intention of appropriating such lands to his own use, and the use of his children; *Held*, that the other partners might follow him, and claim the lands in which the money had been invested; that the partner, in such a case, was but the trustee.

A partner in such case, cannot make such a division and settlement of the assets as will control the other partners. Such a use of the joint funds, will create a resulting trust.

THIS was a bill in chancery, filed by Nicholas King, against John C. Hamilton, administrator with the will annexed of William King, deceased; William Thomas, as trustee and guardian of five minors; John Peter, surviving executor of Joseph King, deceased, and surviving guardian of his two infants, and against Mary A. R. Wade and her husband. The bill alleges that complainant in the year 1829 was a resident of Yorkshire, England, and his brothers, William and Joseph, were residents of Illinois. That during that year, complainants and his brothers entered into co-partnership, for the purpose of dealing in real estate, with a capital of $4,840, which was placed in the hands of William and Joseph, in the proportion of three-fifths for complainant, and one-fifth for each of the others. That afterwards, several pieces of land, (describing them,) in Morgan and Scott counties, were purchased out of said capital, and the titles in fee made to complainant. Some of these lands had been improved, and some had not. That William King took possession and control of a part of these lands, and improved, rented or occupied them, and paid taxes. That William and Joseph, as attornies in fact, conveyed a part of these lands to one Waggoner, for the sum of $1,924; and William, Joseph, or one of them, received the money. That William, as attorney

in fact of complainant, on the 1st of August, 1844, conveyed to Jacob Strawn, other tracts of said land for $2,400, and received the money. That Waggoner re-conveyed a part of his purchase to complainant. That William also sold another part of said lands in April, 1846, to one Richardson, for $808, receiving, in all, from said sales, $3,995.67; of which sum, although complainant had received nothing, he was entitled to three-fifths. That in June, 1843, William being in England, he and complainant made a memorandum in writing, to the effect, that as complainant had advanced three-fifths of the said capital, and William and Joseph each one-fifth, that they would hold the whole of said properties together, with their proceeds, whether by sale or otherwise, in the proportions as above; and each agreed to account to the others for any of the money or other portions of the property they then had received, or might thereafter receive. This memorandum was signed by William and Nicholas. That on the return of William King to Illinois, Joseph King was too sick to sign the memorandum, of which sickness he died, and never signed.

That on the 29th of June, 1843, complainant executed his bond to William King for $968, bearing interest at five per cent. That on the 28th of June, 1843, complainant paid to William for Nicholas, the sum of four hundred and seventy-one pounds six shillings and sixpence, sterling money, which William gave a receipt for, and was to pay over to Joseph. That Joseph being ill on the return of William to the United States, William did not pay him the said last named sum. That Joseph died, leaving a will, naming his brother William and John Peter as executors; who assumed such duties, and were also appointed guardian of the children. That William accounted to the estate of Joseph for the above last named sum, received in England of complainant. That in 1845 and 1846, William used $3,000 of the said trust or partnership funds, in the purchase of lands in the county of Clayton, in Iowa, said lands amounting to 1428 acres, more or less. That William published his last will in August, 1842, and died on the 11th of July, 1846. That William Thomas acts as guardian of his minor children, and John C. Hamilton is administrator, with the will annexed, of said William King. That said Thomas and Hamilton, or one of them, since the death of William King, up to the year 1850, have or has been in the receipt of the rents and profits of certain lands referred to; of which complainant has received $256.37. That at the fall term, 1849, of the Morgan Circuit Court, said Hamilton instituted a suit, by attachment, against complainant, and recovered judgment for some $1,400. That one Robert Caulters also obtained a

judgment upon an attachment process against complainant for $5,745.95. That complainant removed from England to Illinois in 1849, and settled in said county of Morgan. That at an expense of $150, for advertising, and the agency of David A. Smith, complainant sold 643 acres of the land at auction, for $10,499.40, partly on a credit, and one-sixth cash in hand ; and gave the cash received, together with the notes, into the hands of Thomas, who, as trustee, represented Joseph and William King, deceased, the estates of said Joseph and William having each one-fifth of said interest, and complainant three-fifths, the said·three-fifths to be applied in liquidation of said judgments against complainant. The bill made the parties as first stated, and prayed that the said Hamilton and Thomas give a description of the lands in Clayton county, Iowa, and when, of whom, and with what funds, said William King purchased the same, and that complainant be declared undivided owner of three-fifths thereof, and that they state, if funds received from the sales of land to Strawn and Richardson, were not invested in said Iowa lands ; also prayed the appointment of a special master, to take and state an account between the parties, and for a decree upon the account so reported. The amendments to the bill showed that only $2,507.30, of the original capital was invested in lands, and that a portion had not been accounted for by William and Joseph King. That complainant owned forty-nine head of cattle, the proceeds of which were, by William and Joseph, invested in improvement of partnership lands, and also he had some 425 bushels of wheat, which remained unaccounted for.

Thomas, for himself and the heirs, answered, denying the partnership. Denies that the money was placed in the hands of William King, or that any excess beyond the amount invested passed into his hands ; that William was in any way indebted to Nicholas King. Denies that any account was kept by William or Joseph King of receipts or expenditures connected with the lands. Answer states that nothing is known of the sales of the lands, save what appears of record. As to purchases in Iowa, nothing is known except from hearsay ; but do not believe that the whole of said purchases were intended for the benefit of the trust fund, but that William purchased a portion of said lands for his own use and occupation, and other portions for two step-daughters. That said William designed to account for the trust fund in cash, and did not intend that Nicholas or the heirs of Joseph should have any interest in the purchases in Iowa. Denies that the money received from Strawn or Waggoner went into the Iowa lands. Hamilton's answer is of the same import. He denies any consent to the employment

of Smith as agent and attorney; that this employment was for the exclusive interest of Nicholas King, to avoid a sale of the lands by the sheriff under the executions against him; and that he was more than compensated for the services of Smith by the increased price which the land brought, upon a private sale on a credit.

A special master was appointed, who reported the partnership in relation to the purchase of the lands substantially as stated by the complainant, but that the investment amounted to but $2,407.36, which was made by complainant; that the lands were sold to Strawn, Waggoner and others; that complainant, from his individual means, purchased and left on one of the farms, before he returned to England, fifty head of young cattle, four yoke of oxen, one horse, one wagon, a small lot of hogs, and some farming tools, which were disposed of by William and Joseph, and the proceeds expended by them in the management of the farm; that they also sold 425 bushels of wheat to one Hodges for $425; that William King, in his own name, made the purchases of land in Iowa; and that they were made on joint account with moneys derived from the sale of Illinois lands, with the exception of a homestead of 268 acres; and that one witness proves that the two step-daughters were to have lands conveyed to them, when he should receive funds of theirs equivalent to the cost; that the Illinois lands had been disposed of, and the proceeds divided pursuant to the agreement of the parties interested; that the agreement and allowance to D. A. Smith were reasonable and proper, and ought to be charged in proper proportion, to the respective parties.

The proportionate allowances to and against the several parties to the bill, were also stated and exhibited.

At a special term, December, 1853, of the Morgan Circuit Court, WOODSON, Judge, presiding, it was decreed that complainant should recover of the estate of William King $5,095.38, and of the estate of Joseph King $272.24; that it appearing to the satisfaction of the court that the said William King, deceased, entered the Iowa lands for the use of himself, his step-daughters, etc., the complainant should not be allowed any right, title or interest in them. The complainant appealed, and assigned several errors; and among them that he had not been decreed an undivided three-fifths of the lands in Iowa.

D. A. SMITH, for Appellant.

THOMAS and BROWN, for Appellees.

13

SCATES, J. This was a bill for an account, as originally framed, for an account as between partners; as amended, it embraces two items, claimed individually by plaintiff, but which were as strictly and technically a trust as the partnership affairs. I shall only notice the pleadings and evidence, as they present the questions argued before us.

First, in relation to the statute of limitations to the two individual items of account.

By the statute, "replications shall be general, with the like advantages to all parties, as if special." (Rev. Laws, 1845, p. 96, Sec. 31.) The proof has made it specific.

The pleadings, proofs and exhibits show that plaintiff was a resident of England, and remained beyond the limits of this State until 1849, when he returned to this State, and commenced this action January 31st, 1851. But the act of 1827, which contained an exception in favor of non-residents, was repealed in this particular act of 1837. (See acts 1837, p. 160, and Rev. Laws, 1833, p. 442, Sec. 7.) So the statute has run, and the cause of action is barred as to any claim for wheat.

In relation to the cattle, the proofs show that they were bought and left upon the farm by plaintiff, in 1831. His two brothers carried on the farming and improvements on the partnership account during 1831, 1832, and 1833. In the spring of 1831, part of the cattle were sold for $374, and in the spring of 1833, another part were sold for $512; and these sums were spent for current expenses and improvements on the farms, while managed by them. Afterwards, the remainder were sold to a lessee, and the amount included in a note for his other indebtedness to plaintiff, which was executed at the instance, and left in the care of William King, the acting manager thereafter; which, since his death, has been found among his papers, and delivered to plaintiff. We are satisfied from the evidence that these cattle belonged to plaintiff, individually. But the only evidence upon which we can form an opinion as to the purposes, objects, and intention with which this property was left in care and management of William and Joseph, the two acting partners, and its connection with the partnership enterprise, is the actual disposition made of it by them. From this, it would seem, that the partnership enterprise contemplated improving and tilling the lands, or some of them, which they actually did for three years after plaintiff left the country. In this view, we should treat the cattle as an advancement of private funds to be used for partnership purposes. When it was to be accounted for, whether before the general or special partnership accounts were taken, does not appear; consequently, it is not shown when the cause of action accrued. The cattle were as purely

a trust, as the partnership property. It is true, an action at law might lie for the cattle, or the proceeds, as upon any other similiar bailment, when a right to the return of either accrued according to the terms of the contract. But when was that? If the bailment was to continue during the partnership, as an advancement for partnership purposes, it would end, and an action accrue, upon a dissolution, or the taking of the partnership account. This is so intimately blended with the funds, the management and duration of the partnership, as part of the means of carrying it on, that we cannot by arguments, presumption or intendment, supply the deficiences in the evidence in not showing when plaintiff could have withdrawn it from partnership uses. Three hundred dollars were returned to plaintiff in the shape of the note referred to, and by the other partners. But, in taking the account as between plaintiff and his brother and partner, William King, this sum with interest has been allowed the latter. This appears to us to be erroneous. The statute of limitations cannot be made to operate as a set-off, and under it, recover what has been paid. We presume this was done, under the view that the cattle were partnership property, and one was chargeable with what he received, and the other entitled to credit for his payments. But taking a different view of the ownership, from the positive evidence of a nephew, who lived with the partners here, and knew from personal knowledge of the condition of the partnership property, its management and condition, we do not feel at liberty to disregard his positive statements, upon doubtful presumptions which have no foundation to rest upon.

We must therefore put the proceeds of the two sales of the cattle, as individual property, and from its intimate connection and use with the partnership enterprise, we must put it, in relation to the statute of limitations, upon the same footing as the partnership trusts themselves, and as a continuing trust.

The statute of limitations will not bar these, as between trustee and *cestui que trust*, (Angell on Limitations, 161, 2), whether it be of personalty or realty. Ibid. 507.

The distinction, as to its not belonging exclusively to a court of equity, as in *Lyon* v. *Marclay*, 1 Watts, 275, or its staleness by great lapse of time, as in *Piatt* v. *Vattier*, 9 Pet. 416, and *McKnight* v. *Taylor*, 1 How. U. S. R. 161, do not affect it, as before remarked, because it is so intimately blended with the partnership enterprise, as a continuing equitable trust, that we are not shown when that partnership lost the right to its further use, and when the action accrued for a return of this sum.

We are, therefore, of opinion that in taking the account, plaintiff should have been allowed this sum against the partner-

ship, and not William King, with interest.    Neither should he
be charged, nor William King credited, with the $300, the
balance of the proceeds of the cattle, paid over in the note on
his nephew, John King.

There was an allowance to William King, the acting partner,
for services, for about twelve years, at $11.25 per annum, with
interest.

The law will allow the expenses and charges of trustees and
partners.    But if no provision is made for compensation, by deed
of trust, or articles or terms of the partnership, they are not
entitled to it for services; all the partners are bound to render
their service and skill, unless exempted by agreement.    If
exempted, and service is rendered, it may demand pay.    1
Johns. Chan. 510, 535, 623, 629, 431; 1 Monr. 151; 11 Ill. 397,
398.    Story on Part., Sec. 182.    And upon these principles, the
item of $150 to D. A. Smith, is a proper expense.    The allow-
ance of interest, we think, was proper, upon the items of mutual
account; not on account of long delays, but because the whole
enterprise contemplated an active use of capital, with the object
of its increase, whether in land or money.

The most important question presented is for the ascertainment
of the right to about 1400 acres of land in Clayton county,
Iowa, purchased by William King, in his own name, just before
his death, in 1846.

We believe the evidence satisfactorily shows that these lands
were purchased with the partnership moneys, and that there is,
therefore, a resulting trust to plaintiff, and the heirs of Joseph
King, in the proportion of three-fifths to the former, and one-
fifth to the latter, which is very clearly proven to be their pro-
portionate interests in the partnership property.    The court
should, therefore, have made its decree accordingly.    This prin-
ciple was laid down in *Coates* v. *Woodworth*, 13 Ill. 654, and
*Williams* v. *Brown et al.*, 14 Ill. 203.    2 Story Eq. Juris., Secs.
1207, 1210, 1211.

The reasons which have brought us to this conclusion upon
the evidence, we can briefly state.

It is clearly proved, and admitted on both sides, that plaintiff
owned three-fifths, William one-fifth, and Joseph one-fifth of the
lands in Illinois.    Part of these lands were sold to Strawn, and
part to Richardson.

John King testifies that the money which was taken to Iowa
and laid out in lands there, was obtained of Strawn and Richard-
son.    Mrs. William King corroborates him as to the money from
Richardson.    We can entertain no doubt upon this proof of the
ownership of the money.    But it is further corroborated by
William King himself, in his letter to plaintiff.    Speaking of the

sales, value, etc., of the Illinois lands, he declared his purpose to go beyond the Mississippi, into the country west, to look at it, with a view to investment.

It is sought to rebut this resulting trust, by showing that William bought the greater part of these lands for a homestead, and the remainder for John King, and his step-daughter ; and that he intended removing to and making them his homestead in a short time.

This may be sufficient to show an intention to appropriate, and an appropriation of this portion of the funds to his own private use; and which, with the consent of the other partners, he might have done.

But the right of the other partners, or of the *cestui que trust,* in his election, to follow and claim specifically the thing in which his money is invested, is paramount to the trustee, agent, or partner's right to appropriate and convert. He may not alone make such a division and settlement as will control the party in interest.

Such seems to be the character of this controversy on this point. There is proof enough to satisfy us that he intended these purchases for himself and others. But plaintiff elects to pursue his capital into this investment, and reclaim it specifically. To deny or control his right, even by the clearest possible intention of the trustee or agent to the contrary, is to overturn the whole doctrine of resulting trusts, and allow and sanction a breach of trust, as the ground of title. That the trustee has himself innocently, and without fraudulent intent, appropriated the trust fund, can make no difference. The right to follow and reclaim the thing must remain in the *cestui que trust,* as between himself and the trustee, and as to others who purchase, with notice of the trust. Fonbl. Eq., Book 2, Mar. p. 119, top, 395, note. *Phillips et al.* v. *Crammond,* 2 Wash. C. C. R. 442 ; *Wallace et al.* v. *Duffield and wife,* 2 Serg. and Raw. 529 ; *Dey* v. *Dey,* 2 P. Wms. 414 ; *Lane et al.* v. *Dighton et al.,* Ambl. 413 ; cites also *Ryal* v. *Ryal,* and *Balgney* v. *Hamilton.* I presume at this day no court would feel at liberty to follow *Kirk* v. *Webb,* Pres. in Chan., and *Halcott* v. *Maskant,* ibid. 168, in holding that money could not be followed because it had no ear marks, if it were clearly shown that it had been laid out for a particular piece of property.

It is, therefore, quite immaterial that William King intended these lands for himself; having paid for them with the partnership moneys, the other partners have a right to an interest with him, in the proportions of their interests in the moneys paid for them. Such should have been the decree.

Decree reversed and cause remanded to take the account in accordance with this opinion.

*Decree reversed.*